HON. R. H. MARR,
HON. A. DEBLANC,  } *Associate Justices.*
HON. W. B. EGAN,
HON. W. B. SPENCER,

### No. 6564.

30   1
44  204

## *FRANK WATSON vs. MRS. E. F. BONDURANT.

Where a person has a domicile in a State, and the evidence shows that he resides there with the intention of remaining, he is, in contemplation of the laws providing for the removal of causes from State to Federal courts, a citizen of that State.

Citizenship in a State is not lost by a temporary absence; but a prolonged residence in another State, accompanied by other acts, or by declarations showing an intention to acquire a domicile in the latter State, will forfeit citizenship in the former State, and preclude its being set up in a suit.

To qualify in this State as natural tutrix, or as testamentary executrix, *without giving bond,* is strong proof of an intention to permanently reside here, and is utterly incompatible with the claim of citizenship in another State.

A merely auxiliary proceeding, by which a third person comes in by way of injunction to protect his property from being seized and sold under a judgment to which he was not a party, is not removable, under the act of Congress of March 3, 1875, from the State to the Federal court.

---

*This decision and the decision in the case of Schwartz vs. the Crescent City R. R. Co. should have been published in the 29th Annual, but were accidentally omitted.

No mortgage has any effect as to third persons unless recorded; and save in the single case of the minor's mortgage on the property of the tutor, *every* mortgage ceases to have effect, except as to the parties to it, unless re-inscribed in ten years from the date of its original inscription. Neither the existence of the pact *de non alienando* in a mortgage, nor the pendency of a suit to enforce the mortgage obviates the necessity of its inscription, or its re-inscription.

To confirm a judgment by default, involving the assessment of damages, a jury is necessary.

APPEAL from the Thirteenth Judicial District Court.   *Hough*, J.

*Merrick, Race & Foster* for plaintiff and appellee.   *S. R. & C. L. Walker*, for defendant and appellant.

The opinion of the court was delivered by

MARR, J.   Walter E. Bondurant died at his domicile at Natchez, Mississippi, in June, 1874, leaving a will by which he devised his entire estate to his wife, Mrs. Ella F. Bondurant, whom he appointed sole executrix.

The will was admitted to probate in the proper court, at Natchez, on the sixteenth June; but it does not appear whether there was any property or estate in Mississippi to be administered; nor that the executrix qualified there.

On the nineteenth June Mrs. Bondurant presented a petition to the parish judge of Tensas parish, Louisiana, with a copy of the will and the proceedings of the chancery court at Natchez admitting it to probate, in which it is stated that she was then residing in New Orleans; that she was pregnant; and that deceased had left, in Tensas parish, a succession, consisting of movables and immovables, and debts.   She prayed that a curator be appointed for her unborn child; and that she be permitted to qualify as testamentary executrix.   Her father was appointed and qualified as curator; and she qualified as executrix under the will.

In June, 1875, Mrs. Bondurant caused to be revived, in her name, as testamentary executrix and as natural tutrix of her posthumous son, a judgment which her husband had obtained in the district court of Tensas for a large amount against John, Albert, and Horace Bondurant; and upon this judgment she caused an alias writ of execution to be issued.

Under this execution the sheriff seized a tract of land in Tensas, in the possession of Frank Watson, who claimed it as owner.   Watson enjoined; and the citation and writ of injunction were served at the domicile of Mrs. Bondurant, in New Orleans, on the thirtieth June, 1875.

In October Mrs. Bondurant filed a petition, under the act of Congress approved March 3, 1875, for the removal of this injunction suit into the Circuit Court of the United States, alleging that she was a citizen of the State of Mississippi.   Her affidavit to this petition was sworn to before a justice in New Orleans on the thirteenth September.

Watson opposed the removal on the grounds : that the succession of Bondurant, which was opened in Tensas parish, was the defendant ; that when Mrs. Bondurant applied for the executorship she declared herself to be a resident of the State of Louisiana ; and that she was an officer of the probate court of Tensas, and subject to its jurisdiction ; that when the citation and injunction in this case were served on her she was a resident of the State, and the service was made at her domicile ; and that the pretended removal to and citizenship in Mississippi were a mere subterfuge and fraudulent evasion of the law, and adopted for the purpose of removing this cause into the United States Court.

On the trial of the preliminary question of removal, it was proven that Walter E. Bondurant lived and died at Natchez ; that Mrs. Bondurant, before her marriage, lived with her father in New Orleans ; that she returned to her father's, the domicile of her origin, after the death of her husband, and remained until the birth of her child, the precise date of which is not shown. The mortuary proceedings in the succession of her husband were also offered in evidence ; and it was proven that she made affidavits, which were filed in the cause, before justices of the peace in New Orleans in July and September.

The district judge declined to order the removal. A motion was made for a new trial, in support of which one of the counsel of Mrs. Bondurant filed his affidavit, in which it is stated that he had discovered since the trial that he could prove by a member of the bar, who had testified on the trial, that Mrs. Bondurant had consulted him as to whether her residence in the State of Louisiana would forfeit her citizenship in the State of Mississippi ; that on his advising her it would not, she remained in Louisiana, intending to retain her citizenship in the State of Mississippi ; and that this consultation was had with reference to this very case of Watson vs. Bondurant.

The new trial was not granted ; and Mrs. Bondurant filed a protest against any further proceedings in the cause. A judgment by default was taken against her, which was confirmed on proof, and the injunction perpetuated as prayed for ; and she has brought the case here by appeal.

There is no question as to the sufficiency of the value in dispute; and the right of removal depends upon two questions only :

1. Was Mrs. Bondurant a citizen of the State of Mississippi ;

2. Is this such a suit as may be removed into the Circuit Court of the United States.

First. We understand that a person who has a domicile in a State, who resides in a State, *animo manendi*, if he is not an unnaturalized alien, is a citizen of that State within the meaning of the Constitution of the United States, and of the several acts of Congress conferring juris-

diction on the Federal Courts, and providing for the removal of causes from the State Courts into the Circuit Courts. The Fourteenth Amendment settles this beyond doubt. When the domicile or residence is once fixed in a State, the citizenship thus acquired is not lost by a temporary absence, *animo revertendi;* but it is lost, unquestionably, by prolonged absence, and other acts indicating the intention to acquire a domicile elsewhere, accompanied with actual residence at the new domicile.

Before Mrs. Bondurant's marriage her domicile in law and in fact was at her father's residence, in the city of New Orleans. When she married she acquired, immediately, the domicile of her husband; and she could have none other. The death of her husband relieved her of all the disabilities of marriage. She became *sui juris;* and had the right to reside and to acquire a domicile wherever she chose. We think she indicated her choice unmistakably, and without delay.

The will of Walter E. Bondurant is dated June 10, 1874. It was filed for probate on the fifteenth; admitted to probate on the sixteenth; copy of the will and proceedings were certified on the seventeenth; and on the nineteenth Mrs. Bondurant's petition was presented to the parish court of Tensas, praying for letters as testamentary executrix. In this petition she describes herself as "Widow of Walter E. Bondurant, late of Natchez, State of Mississippi, (petitioner now residing in New Orleans, in this State.)"

It was not by any error or inadvertence on the part of the attorney who drew the petition that this statement was made. By our law the testamentary executor who resides in the State is not required to give security; but whenever the testamentary executor, that is, the executor named in the will, is domiciled out of the State, the judge shall only grant him letters on the execution of his bond, with a good and solvent security, for such a sum and under such conditions as are required by law from dative testamentary executors, that is, executors not named in the will but appointed by the court. Act of 1842, section three, page 300; re-enacted in 1855, No. 280, page 309; and in 1870, Revised Statutes, page 287, section 1460. The dative executor is bound to give security for one fourth over and above the amount of the inventory. R. C. C. art. 1679, Civil Code of 1825, art. 1672; R. C. C. art. 1127, Civil Code of 1825, art. 1120. The inventory of the movable and immovable property amounted to $30,062, not including the large judgment in this case, which was for something over $30,000; so that a bond for about $38,000 would have been required.

In order to retain the executorship; it was necessary for Mrs. Bondurant to remain in Louisiana; because the same law requires the judge to appoint a dative executor whenever the executor named in the will is absent. Revised Statutes, page 286, section 1459. The act of 1847,

Revised Statutes, page 288, section 1471, permits tutors, executors, etc., "who only wish to be absent for a time," to retain their offices by leaving a general and special power of attorney with some person residing in the parish in which the succession is opened, or in an adjoining parish, to represent them in all their acts of administration, which power must be registered in the office of the parish recorder.

In the Succession of McDonogh, 7 An. 473, a number of citizens of Louisiana and four residents of Baltimore were named in the will as executors. The Louisiana executors and those residing in Baltimore qualified without giving security. This court held that the appointment of the non-residents without security could not be maintained; and it was vacated.

In Yerkes vs. Brown the testator named his brother, who resided in Philadelphia, as his executor; and he came to New Orleans, rented an office, and qualified as a resident of Louisiana. Shortly after his appointment he returned to Philadelphia, leaving power of attorney with Hennen, who administered several years in his name. The court held that the law was imperative, requiring the executor who is not a resident of the State to give security; and that it is only when the absence is temporary that the executor can retain his office by delegating his powers to another. 10 An. 94.

Mrs. Bondurant appears in this litigation as natural tutrix of her son; and this office, like that of executor, requires residence in the State, only temporary absence being permitted. R. C. C. art. 314. The tutorship must continue until the majority of the child, or until after he attains his eighteenth year, when he may be emancipated. While she is testamentary executrix she can not reside out of the State of Louisiana; but she may close her administration as executrix, and administer as natural tutrix alone. She would still be obliged to reside in the State; and whatever her wishes and intentions might be for the future, she has accepted offices, duties, and responsibilities wholly incompatible with residence elsewhere; and which make it impossible for her to be in any sense a citizen of the State of Mississippi.

The appointment of guardians for minors belongs to the tribunals of the domicile; and if Mrs. Bondurant had continued after the death of her husband to reside in Mississippi, to have a domicile there, that would have been the domicile of her child; and she would have been bound to apply for guardianship to the proper court of that State. She assumes an office unknown to the law of Mississippi, which is peculiar to the law of Louisiana, that of natural tutrix, which is the repeated assumption on her part of residence, domicile in the State of Louisiana; and this office enables her to administer the estate of her child without

giving security, which is required by law of guardians in the other States generally.

If the mere intention to retain a domicile in a State different from that in which a person actually resides would suffice in any case to preserve citizenship, it certainly can not have that effect when the person accepts offices and trusts at the place of residence which are not granted to citizens of other States except on onerous conditions. Mrs. Bondurant could not have qualified as testamentary executrix without giving security, except by satisfying the judge that she was a resident of the State of Louisiana. We will not do her the injustice to suppose she intended to obtain all the privileges and advantages of an actual residence in Louisiana by an untrue statement in a solemn judicial proceeding. A mere visit to her father, with the intention to return to Natchez in a short time, would not have authorized her to claim a residence in Louisiana for the purpose of obtaining letters as executrix without giving security. She ceased to be a resident of Mississippi immediately after the death of her husband. She had no means of preserving a domicile or citizenship in Mississippi except by residence; and it is not shown that she has spent a day at Natchez since she described herself in her petition to the parish judge as "now residing in New Orleans." She has concluded herself on this point by her public acts and declarations, by her continued residence in Louisiana, not less than by her acceptance of the executorship and tutorship. If Mrs. Bondurant is a citizen of Mississippi she is not legally the testamentary tutrix of her husband's will, and the parish court of Tensas would be bound to vacate the appointment or to require her to give security; nor would that court have had the power to recognize her as natural tutrix, since the jurisdiction to appoint a guardian is vested in the proper court of the domicile. The consequence would follow that she is not legally qualified to enforce the rights of the succession in these representative capacities.

Our conclusion is, that Mrs. Bondurant can not be a citizen of the State of Mississippi for the purpose of giving jurisdiction to the Circuit Court of the United States, nor within the meaning and intent of the laws and Constitution of the United States, and of the State of Louisiana, while she is exercising offices and trusts in Louisiana which require actual residence in the State.

Second. We entertain no doubt that the act of March 3, 1875, under which the removal was demanded in this case, was intended to provide for and regulate the entire subject of the removal of causes from the State courts into the Circuit Courts. The first section of the act enlarges and extends the original jurisdiction of the Circuit Courts up to the full limits of the judicial power granted by the Constitution of the United States. This jurisdiction is declared to be concurrent with that of the

State courts ; and the jurisdiction exclusive of that of the State courts is limited to crimes and offenses cognizable under the authority of the United States, and appeals from the District Court.

The second section of the act relates exclusively to those cases which may be removed from the State courts into the Circuit Courts ; and it is in great part a mere repetition of that portion of the first section which relates to the original jurisdiction concurrent with that of the State courts. There is no doubt that any suit of a civil nature, at law or in equity, falling within the original cognizance of the Circuit Courts under this act, may be removed from a State court on the terms and conditions prescribed in this act. Without intending so to decide now, because we do not find it necessary, we incline to the opinion that no suit can be removed under this act from a State court into the Circuit Court which could not have been brought in the Circuit Court by original process.

This case differs from that of Goodrich vs. Hunton, just decided, in this respect, that in that case the litigation was between the same persons who were parties to the original suit, while in this case Watson was a stranger to the original suit. It differs also from Turnbull's case, 16 Wallace, in that in this case there was a petition filed, and citation and a writ of injunction were issued and regularly served on the defendant. But it is precisely like Turnbull's case in these essentials :

1. That under execution on a judgment in a suit to which Watson was not a party his property was seized and was about to be sold ;

2. That he sought relief in the only court in the State which had jurisdiction under the law of the State ;

3. That he proceeded in the form prescribed by the law of the State.

It will be observed that in the Bank vs. Turnbull the removal was under the act of March 2, 1867, which gives the right of removal to the citizen of a State other than that in which the suit is brought, whether he be plaintiff or defendant in "A SUIT," *any suit*, involving the requisite amount, in a State court, in which there is a controversy between him and a citizen of the State in which the suit is brought ; and the attention of the court was directed to the fact that the proceeding under review was not a *suit*, but was in the nature of a motion. The court declined to consider that question, because, " conceding it to be a suit, and not essentially a motion, we think it was merely auxiliary to the original action, a graft upon it, and not an independent and separate litigation." There is no escape from the conclusion, if the decision of the court was correct in this case, that where a third person, not a party to a judgment, intervenes to protect his property, seized under execution on that judgment in the court from which the process issued, that court alone has jurisdiction of the controversy ; and that this proceeding, " *conceding it to be a suit*," is not removable into the Circuit Court *ratione materiæ*.

This decision was under the act of 1867, but the language of that act in describing what may be removed—"A SUIT"—has a much broader meaning and extent than the words used in the second section of the act of 1875, in describing what may be removed—"*any suit of* A CIVIL NATURE AT LAW OR IN EQUITY." If there can be A SUIT in a State court in which there is a controversy between a citizen of that State and a citizen of another State, *not of a civil nature*, or an anomalous nondescript, not *at law or in equity*, it would seem, *ex vi termini*, that it must come within the act of 1867, and be removable under that act, all the other requisites concurring; and it is equally clear that such a SUIT would not fall within the restricted terms of the act of 1875, and would not be removable under that act.

If, therefore, the proceeding on the part of Turnbull & Co., by whatever name it may be called, was not removable under the act of 1867, as the court expressly decided it was not, it is because a SUIT means an original suit, not an auxiliary, dependent, supplementary proceeding, by which a third person interposes to prevent the sale of his property, seized under execution, in satisfaction of a judgment in the original suit to which he was a stranger. If such a proceeding was not a *suit* within the meaning of the act of 1867, and therefore was not removable, there is no logic by which it can be shown that the proceeding on the part of Watson in this case is *any suit of a civil nature, at law or in equity*, within the terms of the act of 1875, and that it is, therefore, removable under that act.

There is another reason in this case, which did not exist in Turnbull's case, and which we think conclusive. The whole object of this proceeding is to prevent the sale of Watson's property, seized under execution, and to do this a writ of injunction, *pendente lite*, to be made perpetual by final decree, was indispensable. Without the power to stay by injunction proceedings in a court of the State, no tribunal could take cognizance of this proceeding. Under the act of Congress of March, 1793, Revised Statutes, section 720, the Circuit Court could not take jurisdiction in such a case by removal from a State court, as was expressly decided in Diggs & Keith vs. Wolcott, 4 Cranch., nor by original process, as was expressly decided in Haines vs. Carpenter, 1 Otto ; and as we have just had occasion to say in Goodrich vs. Hunton, this prohibitory law places such a proceeding as this beyond the power and jurisdiction of the Circuit Courts.

The reasoning and authorities cited in Goodrich vs. Hunton are equally applicable to this case, and are referred to and adopted here without being repeated. We conclude that the District Court properly refused to grant the order of removal, because of the citizenship of the parties,

and because this proceeding is not such a suit as may be removed from a State court into the Circuit Court.

## ON THE MERITS.

The Pleasant View plantation, situated in Tensas parish, consisting of 1400 acres of land and a large number of slaves, were inherited by John Bondurant, Horace Bondurant, Albert Bondurant, and their nephew, Walter E. Bondurant, a minor. To effect a partition, the entire property was sold at public sale, by the sheriff, for three fourths cash, the other fourth, the minor's share, payable on his attaining his majority, in 1862, with interest at seven per cent, payable annually. The property was purchased by the major heirs, and the minor's share was $37,118 50. To secure this a mortgage was reserved in the sheriff's deed, of date fourth December, 1852, in which the clause was inserted by which the purchasers obligated themselves " not to alienate, deteriorate, or incumber said property to the prejudice of said mortgage;" and this deed was recorded on the sixth December, 1852; and was re-inscribed on the eighth September, 1865.

By subsequent partition a tract of 165 acres, part of the 1400 acres constituting the Pleasant View plantation, fell to John Bondurant; and on the thirtieth November, 1854, by public notarial act, duly recorded, he sold this tract to A. C. Watson for $5775, or thirty-five dollars an acre. Frank Watson derives title through A. C. Watson; and it was proven that John Bondurant, from the time he acquired up to the date of his sale to Watson had public, peaceable, notorious possession; and after that time the Watsons had possession in like manner.

The interest was paid up to December 4, 1862; and in March, 1854, a payment of $5018 16 was made, which was credited on the capital sum. In November, 1867, Walter E. Bondurant recovered judgment for the debt with interest; and at sheriff's sale, under execution, he purchased the Pleasant View plantation for $4478, less than half the interest due. Watson was in possession of the small tract purchased of John Bondurant, and Walter E. Bondurant, then a citizen of Mississippi, brought suit against him in the United States Circuit Court in New Orleans to oust him. The case went to the Supreme Court of the United States; and it was decided that Bondurant had not acquired this tract at the sheriff's sale, because the sheriff had not seized it as the law required. See the case, 21 Wallace. This is the property seized under the alias writ, and the subject matter of this litigation.

Plaintiff, Watson, maintains that the mortgage in favor of Walter E. Bondurant had lost its effect as to him by the failure to have it re-inscribed before the expiration of the ten years, as required by article 3333 C. C., article 3369 of the Revised Civil Code.

Watson vs. Bondurant.

Defendant contends that re-inscription was not necessary in this case, because Watson is charged with notice by the pact *de non alienando*, and that the mortgage in favor of a minor need not be re-inscribed.

We had occasion lately to examine the question of inscription and re-inscription, so far as third persons are concerned, in the case of John I. Adams & Co. vs. Thomas Daunis, No. 6532, decided on the second inst., and we do not propose now to repeat what we said in that case. We remark, however, that subsequent investigation has only served to confirm the views we then expressed :

First—That under the positive law of Louisiana, as contained in the Code and the Statutes, nothing supplies the place of registry, or dispenses with it, so far as those are concerned who are not parties to the mortgage ;

Second—That when ten years have elapsed from the date of the inscription, without re-inscription before that time, the mortgage is without effect as to all persons whomsoever who are not parties to the mortgage.

We understand the effect of the pact *de non alienando* to be this : Where a mortgage contains this stipulation, the sale by the mortgagor does not prevent the mortgagee from proceeding by executory process, and he need give no notice to the purchaser. The proceeding by executory process is a proceeding *in rem ;* and if the title under which the mortgagor claims is such that he may thus proceed *in rem*, he need not notice any subsequent alienation of the mortgaged property by his mortgagor ; just as in proceeding in admiralty against a ship, no subsequent change of master or of owner need be noticed by the libelant, who proceeds against the thing itself which is liable to him.

A little reflection will show that the pact *de non alienando* contains nothing that the law does not imply in every mortgage. The mortgagor by the act of mortgage binds himself personally, and binds his property for the debt ; and he necessarily obligates himself morally, and in law, not to deprive the mortgagee of the benefit of the security by alienating or deteriorating or incumbering the property to his prejudice. If the mortgagee records his mortgage, it is not in the power of the mortgagor to alienate or to incumber the property by any subsequent title which will impair or affect the mortgage.

If the mortgagee, instead of proceeding *via executiva in rem* against the property, elects to sue his debtor *in personam* and to attempt to enforce his judgment by execution *via ordinaria*, the pact *de non alienando* will not enable him to seize the mortgaged property in the hands of a third possessor claiming the ownership. He must exhaust his remedy against property subject to seizure under the writ of fieri facias ; and, failing to obtain satisfaction by this means, he can reach the mort-

gaged property only by an action, the regular hypothecary action of our law, against the third possessor; and his mortgage, if properly inscribed, is as available in this form of proceeding without the pact *de non alienando* as it would be with that stipulation. Code of Practice, articles 61–68; Page vs. Générés, 6 An. 550; Desobry vs. Carmena, 9 An. 180.

After the lapse of ten years, without re-inscription before that time, subsequent mortgages are not affected by the first inscription; and neither notice, nor even the pendency of a suit on the mortgage, dispenses with re-inscription. See Sheppard vs. Cotton Press, 2 An. 110; Succession of Lowery, 22 An. 205; Hyatt vs. Gallier, 6 An. 321; Young vs. City Bank, 9 An. 193; Succession of F. Coner, 12 An. 216; Con. Ass. vs. Wilson, 10 An.; Kohn vs. McHatton, 20 An. 223; Britton & Kountz vs. Norment, 20 An. 508; Britton & Kountz vs. Janney, 21 An. 204; Blair & Co. vs. Taylor, 25 An. 148.

The mere reading of article 3333 C. C., article 3369 of the Revised Civil Code, shows that the minors' mortgage which need not be re-inscribed is that to which the property of their tutors is subject by law, as security for the administration of their estates; and there is nothing in the law to take the mortgage in this case out of the rule which imperatively requires re-inscription.

The position of the parties was this: dating from the fourth December, 1852, a mortgage, properly inscribed, secured to the minor, Walter E. Bondurant, his one fourth of the estate inherited by him, or rather the price of this one fourth. This mortgage, in virtue of the inscription, bound the property for and during ten years, without regard to any subsequent changes in title or possession. On the sixth of December, 1862, this inscription perempted and lost its effect, even against the contracting parties; and it would have been the duty of the recorder to have canceled and erased it on the application in writing of any party in interest. Act of 1843, Revised Statutes of 1870, sections 450, 3141, amending C. C., art. 3333 Rev. C. C., art. 3369. From the thirtieth November, 1854, Watson was the owner. and was in possession of the property in question. The mortgage which had affected the property no longer incumbered it in his hands, because ten years had elapsed without re-inscription. The mere failure to cancel the perempted inscription did not revive it. The article of the Code says the inscription must be renewed in the same manner in which it was made. It was dead so far as the first inscription was concerned. The law, however, permits re-inscription; and this mortgage was re-inscribed on the eighth September, 1865, nearly three years after the first inscription had lost its effect even against the contracting parties. The re-inscription gave it effect as a mortgage of the date of that inscription; but at that time the property no longer

belonged to the debtors, the mortgagors; and it had no effect whatever against that property.

The plaintiff in injunction, Watson, demanded two thousand dollars in damages for the unlawful seizure of his property. The judge allowed two hundred and fifty dollars, without calling a jury. This was error. The Code of Practice, article 313, requires the judge where a judgment by default is to be confirmed and damages are to be assessed to have a jury summoned and to give judgment in conformity with their verdict.

It is therefore ordered, adjudged, and decreed that the judgment of the court below be amended so as to disallow the damages awarded to the plaintiff; and to that extent that the said judgment be avoided and reversed; and in all other respects that the said judgment be and it is hereby affirmed; the plaintiff and appellee to pay the costs of this appeal; defendant and appellant paying costs of the court below.

---

### CONCURRING OPINION.

DEBLANC, J.   Daniel M. Bondurant left, as his heirs-at-law, three sons, Albert, John, and Horace, and a grandson, Walter E. Bondurant.

On the fourth of December, 1852, the whole of the property belonging to the succession was sold at auction, and bought by his three sons for $148,474. Two days after, on the sixth of said month, the deed from the sheriff to them was recorded, and it was not re-inscribed until the eighth of September, 1865. Since that date, more than eleven years have elapsed, and the re-inscription has not been renewed.

Of the price of said property, one fourth was due by the purchasers to Walter E. Bondurant, and was to be paid to him at his majority, on the fifth of March, 1862, with interest. That claim was secured by mortgage, containing the stipulation which has been and still is confounded for "the pact de non alienando."

In 1854, on the thirtieth of November, Augustus C. Watson purchased from John Bondurant the land acquired by the latter and his brothers from their father's estate, and subject to the mortgage of the minor Walter. On the fifth of August, 1872, said Watson sold to his sons, Augustus and Frank, the land thus acquired by him from John Bondurant, and, on the sixth of December, 1875, by purchase of his brother's share, Frank Watson became the sole owner of the whole.

Walter E. Bondurant brought suit against his uncles, to enforce his mortgage, and, on the fourteenth of November, 1867, obtained a judgment against them, with a recognition of said mortgage. Under an alias writ of fi. fa., issued from said judgment, the land bought by Frank Watson from his father and brother, was seized on the fifteenth of June,

1875. On the twenty-eighth of said month, he enjoined the execution, on the grounds :

First—That the mortgage in favor of Walter E. Bondurant has perempted for want of re-inscription ;

Second—That he is a third possessor ; that he was not made party to the suit in which the said Watson obtained the judgment he is seeking to execute against him, and that, as third possessor, he was entitled to and was not given the notice prescribed by law.

In answer to plaintiff's injunction defendant alleges ;

First—That, in the contemplation of the law and by the effect of the pact *de non alienando*, the whole of the land mortgaged remained in the hands of the original debtors ;

Second—That, except in certain specified cases, peremption does not run against minors.

In the act of sale from the sheriff to Albert, John, and Horace Bondurant, there is the clause which, for over forty years, has been construed and enforced as the pact *de non alienando*. Does that clause prohibit the sale of the mortgaged property ? It does not. John Bondurant had the right to sell ; he sold. Frank Watson had the right to buy ; he bought. The several acts of sale passed from 1854 to 1875 were duly recorded and became as many notices to the world. 8 R. R. 165, Ducros vs. Foster.

In disregard of those recorded titles, under an execution issued on a judgment against John, Albert, and Horace Bondurant, a tract of land which had ceased to be their property, which was no longer in their possession, was seized to satisfy said execution, and that land was so seized with the full knowledge that it was then the property and in possession of Frank Watson. Is not that seizure a manifest violation of the spirit and letter of our law ?

At the date of the seizure, Frank Watson was, and he is now a third possessor : as such, he should have been called upon to pay the mortgage claim, if any such existed, or surrender the hypothecated property. This done, and he failing to discharge the debt, the property should have been seized under proceedings instituted against him, the owner and possessor, and he should have been notified, as the law requires, of the seizure and intended sale of his property. To this rule, in law, there is no exception. There are not, in Louisiana, two classes of third possessors of mortgaged property, one against whom the creditor must proceed regularly, and another whose title may be divested without even the necessity of a single notice.

It is contended that, when the creditor proceeds under an act which contains the pact *de non alienando*, he can seize, not only from the owner and possessor, but from the first vendee and original mort-

gagor and sell, as belonging to the latter, the property which the vendor and mortgagee, knows to have been sold by his debtor, and to belong to another. Is it not time to correct an unjust practice, an abuse, and to discountenance an arbitrary exception to the sound and equitable rule of our Codes?

In Louisiana, when it was a Spanish colony and under the Spanish law, the clause *de non alienando* absolutely prevented the transfer of hypothecated property, and any transfer made in contravention of that clause was a nullity. It impeded what our legislation favors, the transmission of property. In the first of its decisions on this question the Supreme Court said that "the mode of proceeding under an order of seizure and sale was, in a great measure directed, by the Spanish law, under which any transfer made in violation of the clause *de non alienando* was, *ipso jure*, void as to the creditor." 2 N. S. 34 and 35.

That law can no longer be invoked, not even under the pretense that it is not repugnant and contrary to our Code, and, nevertheless, from time to time the colonial rule supersedes the State law. C. C. of 1825, art. 3521.

In lieu of the prohibition to alienate, we have the 3397th article of our Code, which provides: "that the debtor can not sell or mortgage *to the prejudice* of a previous mortgagee."

Is a vendor's right in any way increased by the insertion, in an act of sale, of a clause in and by which the purchaser, adopting the very expression of our Code, binds himself not to sell the mortgaged property to the detriment of the vendor's interest?

If that useless insertion constitutes a pact *de non alienando*, there can be, in our State, no third possessor of mortgaged property, and the hypothecary action need never be resorted to ; for, whether written or omitted, the condition not to sell to the prejudice of the creditor, is one fixed by a law which is a part of every contract of mortgage, and, in any and every case, with or without the insertion of that clause, the creditor, under the construction contended for, may proceed against his immediate vendor, in spite of the subsequent transfer or transfers of the hypothecated property, and thus deprive the owner and possessor of those rights of defense which are not denied to even the trespasser.

The article of the Code which provides that the debtor shall not sell to the prejudice of the creditor, recognizes the debtor's right to sell, for it also provides that, if he does sell, the creditor may follow the mortgaged property, in whatever hands it may have passed, and compel the third possessor to pay the debt or relinquish the property. As to the mode of proceeding against third possessors, the Civil Code makes no

difference, and merely refers to the Code of Practice. C. C., arts. 3397 and 3398.

This court has decided that the third possessor of property mortgaged, with the pact *de non alienando*, occupies no better position than the mortgageor. This we admit; but why, in whose interest, under what law is he entitled to less than the mortgageor? To exercise his rights, to enforce his claims, the creditor must cause the property to be seized and sold. It is more difficult to seize it when it is in the hands of the third possessor, than when it is not, and from one who has parted with title and possession?

Though the third possessor occupies no better position than the mortgageor, he has at least the privilege of paying the debt and retaining the property. Under the actual jurisprudence, not the Codes, in order to enjoy that acknowledged right, he must guess that the mortgage claim is not satisfied, who holds that claim, which may have been thrown in the channels of circulation, and how, when, where, and by whom his property is to be sold.

If such a course be sanctioned, what shall become of the constitutional prohibition to deprive any one of property, without process of law? With the legal value given to the pretended pact, there is not left a vestige of that process. Without any demand, written or verbal, without notice of the parody of a seizure, still more, under a decree rendered against A, a writ issued from that decree, commanding and which could command but the seizure of A's property, the property of B is seized, advertised for sale, and sold.

Sooner or later, we will have to choose between our own law and the sprout of a law which has passed with the Spanish dominion.

I concur in only the conclusion of Mr. Justice Marr.